# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 19, 2011 Session

## STEPHEN BROWN v. COLUMBIA PRECAST, LLC, ET AL.

### Appeal from the Circuit Court for Maury County
### No. 10988      Jim T. Hamilton, Judge

### No. M2010-00971-COA-R3-CV - Filed July 21, 2011

An employee was promised 10% ownership interest in the company he worked for if he stayed with the company for six years. When the time came to transfer the employee's 10% interest to him, however, the parties learned that the tax laws then in effect made the transfer impractical at that time. The parties therefore decided to delay the transfer. The parties entered into a contract the following year which the employer interpreted to mean that the employee was giving up his 10% ownership interest in exchange for a raise in his salary plus 10% of the company's net profits each year. The employee claimed he did not give up his 10% ownership interest and sued the company and former majority owner for his 10% interest when the company was sold a few years later. The trial court concluded the employee did not give up his 10% ownership interest by signing the later agreement and awarded the employee 10% of the company's net profits for the years following the employee's termination plus 10% of the ultimate purchase price. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

T. Jake Wolaver, Columbia, Tennessee; John D. Kitch, Nashville, Tennessee, for the appellants, Columbia Precast, LLC, Roger Teague, Barbara Teague.

Ben Boston, Ryan P. Durham, Lawrenceburg, Tennessee, for the appellee, Stephen Brown.

# OPINION

## I. BACKGROUND

Columbia Concrete was in the business of manufacturing architecturally designed concrete panels for commercial buildings. Stephen Brown began working for Columbia Concrete in 1996. Mr. Brown had been in this business for several years and was the plant manager for a different company before he started working for Columbia Concrete.

Roger Teague and his wife Barbara purchased Columbia Concrete in 1997 and changed its name to Columbia Precast, LLC[1] (referred to alternatively as "Columbia Precast" or the "Company"). Mr. Brown testified Mr. Teague retained Mr. Brown as an employee and made him the general manager of operations. Joe Taylor had worked with Mr. Brown at Columbia Concrete as the person in charge of quality control, and Mr. Teague retained Mr. Taylor in that position when he purchased the Company.

Mr. Brown testified that around the time when Mr. Teague purchased the Company, he told Mr. Brown that in exchange for Mr. Brown's experience and ability to help Columbia Precast's business grow, Mr. Teague would make Mr. Brown a 10% owner of the Company after five years. Mr. Teague did not indicate Mr. Brown would have to pay any money for this interest; Mr. Brown was just required to continue working for the Company in the same capacity for five years. This offer was not put down in writing, but was made orally.

The evidence showed Mr. Brown worked closely with Mr. Taylor at Columbia Precast, and Mr. Brown asked Mr. Teague whether he would offer the same 10% interest to Mr. Taylor. Mr. Teague agreed and indicated that he would transfer 10% of the Company to both Mr. Brown and Mr. Taylor after five years. All three individuals agreed that the long term goal was for Mr. Brown and Mr. Taylor to purchase the Company from Mr. Teague sometime in the future so Mr. Teague could retire from the business.

The following year, in August 1998, Mr. Brown was injured in a car accident while he was on a business trip. He had to miss work while his injuries healed and to undergo surgery for complications resulting from the accident. The following year, in 1999, Mr. Brown's wife died unexpectedly, and Mr. Brown had to miss more work to care for his two young children. As a result of these unexpected events and absences from work, Mr. Teague changed the terms of his offer and told Mr. Brown and Mr. Taylor that he would transfer the 10% interest in the company to them after six years rather than five years. Mr. Brown and

---

[1]Roger Teague owned 99% of the Company and his wife Barbara owned just 1%. Mr. Teague made all business decisions.

Mr. Taylor accepted this modification in Mr. Teague's offer and continued to perform their jobs as before.

At the end of six years, in or around May 2003, Mr. Brown, Mr. Taylor and Mr. Teague began discussing how to effectuate the transfer of their 10% ownership interests in the Company. They met on several different occasions to discuss the details of the transfers. Ultimately, an accountant informed Mr. Brown and Mr. Taylor during one of these meetings that they would each have to pay $80,000 to $90,000 in taxes if they received 10% of the Company at that time based on the tax laws then in effect. Neither Mr. Brown nor Mr. Taylor was interested in paying such a large tax bill, so the parties decided not to transfer their interests at that time.

The following year the parties executed a document dated July 14, 2004. The document references a meeting that occurred in May 2003 and states the following in its entirety:

> This letter is in reference to a meeting with Roger Teague, Steve Brown and Joe Taylor in May of 2003.
>
> The meeting was in regards to how to handle the transfer of ownership of Columbia Precast, LLC which is to clarify originally:
>
> > 79% Roger Teague
> > 1% Barbara Teague
> > 10% Steve Brown
> > 10% Joe Taylor
>
> However, due to tax implications (which made this transfer outright implausible), this meeting was to work out how to handle the situation to everyone's satisfaction.
>
> The agreement pounded out is as follows in lieu of 10% ownership effective June 1st, 2003:
>
> > Steve Brown's Salary would be increased to $80,000 a year.
> > Joe Taylor's Salary would be increased to $80,000 a year.
>
> It was also agreed that the salaries would increase $5,000.00 each year thereafter.

Roger stipulated that this would continue to occur as long as the company could afford it. The other stipulation was that the profits of the company would be dispersed in such a manner as Steve Brown and Joe Taylor would receive 10% each of the net profit per year.

Mr. Taylor drafted this document, and Mr. Teague, Mr. Brown, and Mr. Taylor all signed the document within the following two weeks. As set forth in the document, Mr. Brown's and Mr. Taylor's salary increased to $80,000 beginning June 1, 2003. Neither Mr. Brown nor Mr. Taylor received 10% of the net profits of the Company for the 2003 year because the Company did not make a profit in 2003.

On or about August 2, 2004, Mr. Teague informed Mr. Brown that he was being let go and that Mr. Brown could choose to resign or be terminated. Mr. Teague's explanation for this decision was that he was not happy with the way Mr. Brown was doing his job and was dissatisfied with the amount of time Mr. Brown was spending away from work. Mr. Brown did not receive 10% of the Company's net profits for any year following his termination, nor was he given a 10% ownership interest in the Company.

Mr. Taylor received 10% of the Company's net profits for the years 2005, 2006, and 2007. In May 2008 Mr. Taylor and another individual purchased the Company from Mr. and Mrs. Teague for $4,000,000. The purchase agreement provided it was "retroactive to December 31, 2007." Mr. Brown was not offered 10% of the purchase price.

## II. TRIAL COURT PROCEEDINGS

Mr. Brown filed a complaint alleging breach of contract against Columbia Precast, Roger Teague, Barbara Teague, and Joe Taylor in September 2004, just a month after being terminated. Mr. Brown claimed he was entitled to 10% of the Company's net profits for each year the Company was profitable until the Company was sold and that he was entitled to 10% of the purchase price. Columbia Precast and the Teagues denied Mr. Brown had any interest in Columbia Precast once he was terminated from the Company.

Following a two-day trial, the court issued a Final Judgment in which it concluded:

The preponderance of the evidence supports the ten percent net profits provision of the parties' agreement was not tied to future employment but instead was an earned benefit that Mr. Brown should have received. The preponderance of the evidence further supports the existence of a contract between the parties which Mr. Teague and Columbia Precast breached causing Mr. Brown damages when Columbia Precast was sold as well as during the

-4-

years between his termination and the sale.

. . . . .

Additionally, had Mr. Teague not breached his agreement with Mr. Brown, Mr. Brown would have received his 10% ownership interest in the company and, thus, the sale proceeds. Mr. Teague sold the company for $4,000,000. Thus, Mr. Brown should have received ten percent, which is $400,000.

Throughout the trial the Court carefully observed all witnesses who testified live in this matter. During the trial and after reflecting specifically upon each witness's appearance and demeanor, the Court finds that all were for the most part credible, even though some of the statements and testimony offered by Mr. Teague were suspect and somewhat slanted. Much of Mr. Teague's believable testimony was actually more supportive to plaintiff's theory than defendant's and verified plaintiff's strong work ethic and helped plaintiff carry his burden of proof.

The court granted Mr. Brown a judgment against the Company and the Teagues jointly and severally for $700,760.79. This amount represents 10% of the 2008 purchase price of the Company ($400,000) as well as 10% of the net profits for 2005 ($60,020), 2006 ($90,861.31), 2007 ($24,581.10), and 2008 ($125,298.38). The court dismissed the complaint against Mr. Taylor.

Columbia Precast and the Teagues appealed the trial court's judgment, arguing the court erred in a variety of ways. First, they argue the document dated July 14, 2004, was a novation, extinguishing any prior agreement regarding Mr. Brown's partial ownership of the Company. Second, they argue the 10% annual net profit Mr. Teague promised Mr. Brown was compensation and therefore payable only while Mr. Brown continued to be employed by the Company. Third, they argue there was no competent proof in the record to support the court's award to Mr. Brown of 10% of the Company's net profits for the years 2005 and 2008.

## III. ANALYSIS

Our review on appeal of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984). We review

a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).

## A.  TRIAL COURT'S FINDINGS OF FACT

The trial court made the following findings of fact:

Sometime either contemporaneously with his hire or shortly thereafter, Mr. Brown and Mr. Teague agreed that at the end of Mr. Brown's fifth year of employment Mr. Brown would receive a ten percent ownership interest in Columbia Precast.  Sometime after this agreement was entered, Mr. Brown suggested that Mr. Taylor be made a part of this agreement since he was working so diligently for Columbia Precast.  However, because of an automobile accident that Mr. Brown was involved in August of 1998 and his wife's death in January 1999, the agreement was modified so that Mr. Brown and Mr. Taylor would each receive a ten percent membership interest at the conclusion of their sixth year with Columbia Precast.  Mr. Taylor and Mr. Brown apparently worked well together.  During their work, the business seemed to do well and grow based in part at least upon the sweat equity Mr. Taylor and Mr. Brown invested in Columbia Precast and for Mr. Teague.

At the end of that sixth year, the parties began discussing how to go about transferring ten percent of Columbia Precast to Mr. Brown and ten percent to Mr. Taylor.  There were apparently tax problems that prevented the actual transfer from taking place at that time as agreed so the parties reduced to writing the agreement which was admitted as Trial Exhibit 1.  According to [the document] in lieu of a ten percent ownership effective June 1, 2003,[2] both Mr. Brown and Mr. Taylor's salaries would be increased to $80,000 a year and both would receive $5,000.00 a year annual raises so long as the company could afford it.  That agreement also specifically says that profits of the company would be dispersed so that Mr. Brown and Mr. Taylor would each receive ten percent of the net profits of the company per year. [The document] is dated July 14, 2004 and was signed by Mr. Teague, Mr. Taylor, and Mr. Brown sometime in the next two weeks, but references May of 2003 as when the agreement was actually reached.  The document . . . is a memorialization of that May 2003 agreement and was drafted by Mr. Taylor.

---

[2]"Effective June 1, 2003" is important because the evidence supports this was a temporary solution, not permanent, as all parties acknowledge the 10% ownership interest was earned after year six.

Shortly after the July 2004 agreement was signed, Mr. Teague forced Mr. Brown to resign. Mr. Teague testified that he intended to terminate Mr. Brown based upon Mr. Brown's work performance. Particularly, Mr. Teague stated that Mr. Brown had unexplained absences, did not perform the full functions of his job, and did not tell him when he was going to be taking off from work. However, the Court finds it difficult to believe that Mr. Teague truly thought Mr. Brown's work performance was poor based upon the testimony of Mr. Sharpe, one of two uninterested witnesses, and the fact that Mr. Teague, who acted and controlled Columbia Precast, LLC exclusively as if it was his alter ego, continued to give Mr. Brown pay raises and bonuses. It is also difficult for the Court to believe that Mr. Teague would sign [the document] dated July 14, 2004 if, as he stated, two weeks later he had so many ongoing problems with Mr. Brown that he was going to terminate him. Regardless, in August of 2004, Mr. Teague terminated Mr. Brown's employment with Columbia Precast by causing the forced resignation.

Mr. Teague and Columbia Precast contend that the agreement marked Trial Exhibit 1 also terminated when Mr. Brown was forced to resign. The evidence supports the salary set forth in Trial Exhibit 1 would end at Mr. Brown's termination but the evidence persuades the Court to conclude that the provision where Mr. Brown would receive ten percent of the net profit was not tied to employment. Also, even after Trial Exhibit 1 was created, the testimony confirmed that if and when the tax implications referenced in that document were resolved that the actual transfer of ten percent membership interest in the company could and would occur. In fact, Mr. Teague testified that any time Mr. Brown came and said he was ready to resolve those tax implications, he would transfer ten percent of the company. This is further consistent with the testimony of Mr. Sharpe who testified he specifically recalled that Mr. Teague did in fact on numerous occasions introduce Mr. Brown as his partner and/or co-owner of Columbia Precast. Mr. Brown, likewise, confirmed Mr. Sharpe's recollection.

Brett Fincher, the other uninterested party to testify, stated that he worked with Columbia Precast and handled their retirement plan for several years. . . . . Mr. Fincher was involved in 2003 when Mr. Brown had finished his sixth year of employment when the parties were discussing the actual transfer of ten percent ownership interest. Mr. Fincher testified that there were tax implications that they tried to work through realizing that tax laws change and the possibility that the actual transfer could occur in the future without those tax implications. He also testified that he believed the long term goal

was for Mr. Brown and Mr. Taylor to purchase all of Columbia Precast from Mr. Teague in addition to the combined twenty percent they had earned as a result of their previous agreements and labors. Mr. Fincher also agreed that Mr. Teague wanted to make sure that Mr. Brown and Mr. Taylor were taken care of on the ten percent interest because they put their all into the company and made the company grow and that Mr. Teague appreciated that and the reason it grew was because of Mr. Brown and Mr. Taylor's efforts.

## B. DOCUMENT DATED JULY 14, 2004

The interpretation of written agreements is a matter of law that appellate courts review *de novo*. We accord no presumption of correctness to the trial court's conclusions of law. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (citing *Guiliano v. Cleo,* 995 S.W.2d 88, 95 (Tenn. 1999) and *Union Planters Nat'l Bank v. Am. Home Assurance Co.*, 865 S.W.2d 907, 912 (Tenn. Ct. App. 1993)); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005).

Ascertaining and giving effect to the parties' intent is of utmost importance when interpreting a written contract. *Allstate*, 195 S.W.3d at 611 (citing *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005)). Courts look to the plain meaning of the words used in the document to determine the parties' intent. *Allstate*, 195 S.W.3d at 611. If the words used in a contract are clear and unambiguous, the literal meaning of the words used controls the interpretation. If the contractual language can be understood in more ways than one, however, the contract will be deemed ambiguous and a court will consider parol evidence to guide it in construing the document. *Id.* at 611-12. The parol evidence the court will consider includes the parties' conduct and statements regarding the meaning of the disputed portion(s) of the contract. *Id.* at 612 (citing *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001) and *Vargo v. Lincoln Brass Works*, 115 S.W.3d 487, 494 (Tenn. Ct. App. 2003)).

The document dated July 14 is unambiguous that as of January 22, 2003, Steve Brown and Joe Taylor each had earned 10% of Columbia Precast, but that due to tax implications transfer of the 10% interests could not take place. The ambiguity appears towards the end of the document:

The agreement pounded out is as follows in lieu of 10% ownership effective June 1st, 2003:

Steve Brown's Salary would be increased to $80,000.00 a year.
Joe Taylor's Salary would be increased to $80,000.00 a year.

It was also agreed that the salaries would increase $5,000.00 each year thereafter.

Roger stipulated that this would continue to occur as long as the company could afford it. The other stipulation was that the profits of the company would be dispersed in such a manner as Steve Brown and Joe Taylor would receive 10% each of the net profit per year.

The Company and the Teagues argue the meaning of the "in lieu of" language is that the salary increase was to take the place of Mr. Brown's and Mr. Taylor's 10% interest in the Company, with the result that Mr. Brown and Mr. Taylor were not ever going to receive a 10% ownership share in the Company. However, this interpretation fails to harmonize the other part of the document and renders meaningless the earlier section indicating Mr. Brown and Mr. Taylor earned their 10% ownership shares of Columbia Precast as of January 22, 2003.

Documents should be interpreted in such a way that each provision can be given effect and no provision is neutralized or rendered meaningless. *Maggart v. Almany Realtors*, 259 S.W.3d 700, 704 (Tenn. 2008). In other words, all provisions should be construed in harmony with each other to avoid repugnancy between the various provisions of a single contract. *Sumner County Bd. of Educ. v. Carden Co.*, 2006 WL 2069413, at *2 (Tenn. Ct. App. July 25, 2006).

We believe the more reasonable interpretation of the parties' agreement is to construe the "in lieu of" language to mean that instead of **transferring** 10% of the Company to Mr. Brown and Mr. Taylor when they earned their interests, the Company would increase their salaries each year. Consistent with the acknowledgment that Mr. Brown and Mr. Taylor had already earned 10% ownership interest in the Company, the document also provided they would each receive 10% of the Company's net profits each year.

We do not believe the document affects Mr. Brown's and Mr. Taylor's 10% ownership interests in the Company, as they had already earned this interest a year and a half before the document was drafted, and four months before the meeting in May 2003 that the document was meant to memorialize. The Company and the Teagues' argument that Mr. Brown agreed to accept an increase in salary and 10% of the net profits of the Company in exchange for his 10% ownership interest is not supported by the language of the document or the evidence presented. Mr. Brown's and Mr. Taylor's interests in the Company were earned before the May 2003 meeting and did not depend on their continued employment. Mr. Teague's termination of Mr. Brown's employment, therefore, did not affect the interest Mr. Brown had already earned in Columbia Precast.

The parol evidence presented at trial supports this interpretation of the parties' agreement. Mr. Teague testified that any time Mr. Brown came and said he was ready to resolve the tax implications, he would transfer ten percent of the Company to Mr. Brown, even after the document dated July 14, 2004, was signed. Mr. Teague's actions introducing Mr. Brown to third parties as an owner of the Company also showed Mr. Teague considered Mr. Brown to be a partial owner of Columbia Precast.

Mr. Brown testified he never intended to give up his ownership interest in the Company and that he believed Mr. Teague would transfer his 10% interest in the Company to him any time he asked for it, even following his execution of the July 14 document. It is against reason to presume that Mr. Brown would act against his own interest by accepting an increase in salary and the possibility of 10% net profits per year in place of the 10% ownership interest he had already earned, especially considering the ownership interest was not tied to his continued employment and could not be taken from him. *See Commerce Union Bank v. Burger-In-A-Pouch*, 657 S.W.2d 88, 91 (Tenn. 1983) ("it is against reason to presume that a creditor would act against his own interest by accepting a renewal note with intent to discharge an original note, and so release a solvent surety").

### C. JULY 14, 2004, CONTRACT WAS NOT A NOVATION

The Company and the Teagues argue the document dated July 14, 2004, was a novation and therefore extinguished the parties' earlier agreement regarding Mr. Brown's ownership interest in the Company. A novation is the substitution of a new contract for an existing contract and extinguishes the earlier agreement. *Pacific Eastern Corp. v. Gulf Life Holding Co.*, 946 S.W.2d 946, 958-59 (Tenn. App. 1995). The four essentials of a novation are the following: (1) a prior valid obligation, (2) an agreement supported by evidence of intention, (3) the extinguishment of the old contract, and (4) a valid new contract. *Burchell Ins. Services v. Western Sizzlin Steakhouse of Dyersburg*, 2004 WL 1459398, at *3 (Tenn. Ct. App. June 29, 2004).

Mr. Brown argues that claiming there was a novation is an affirmative defense and that the Company and the Teagues waived this argument by not asserting a novation in their Answer to his Complaint. While it is true that the Company and the Teagues did not assert the existence of a novation as an affirmative defense per se, they responded to one of Mr. Brown's allegations by stating: "Mr. Teague, Mr. Taylor and Mr. Brown agreed that in lieu of the membership interest transfer to Mr. Taylor and Mr. Brown, Mr. Taylor and Mr. Brown's compensation would increase from $57,000.00 per year to $80,000.00 with an additional annual increase of $5,000.00 per year, if economically feasible for Columbia Precast, LLC."

The issue of whether or not the agreement to increase Mr. Brown's and Mr. Taylor's salaries to $80,000 and give them 10% of the Company's net profits was in lieu of the parties' earlier agreement that Mr. Brown and Mr. Taylor would receive 10% of the Company was the main issue in the case and was litigated at trial. The question of novation was therefore tried by implication even though the Company and the Teagues failed to use the term "novation" in their pleadings to describe their argument. Consequently, we hold that the Company and the Teagues did not waive the right to assert that the July 14, 2004, document constituted a novation. *See Estate of Fetterman v. King*, 2004 WL 1906449, at *2 (Tenn. Ct. App. August 26, 2004) (plaintiff's argument that claim of novation was not properly before trial court has no merit where issue of novation was tried by implication).

The Company and the Teagues' novation argument is based on their interpretation of the July 14, 2004, agreement: that Mr. Brown agreed to give up his 10% interest in the Company for an increase in salary and the possibility of 10% net profits per year. As we discuss above, we do not accept this interpretation of the agreement. Construing the agreement as we do, *i.e.*, that the increase in salary and promise of 10% net profits are in lieu of the transfer of Mr. Brown's 10% ownership interest to him when it was earned, renders the novation argument meaningless. The July 14, 2004, agreement cannot be a novation because it does not alter or affect Mr. Brown's and Mr. Taylor's ownership interest in the Company that was the subject of the earlier agreement. Therefore, since the July 14, 2004, agreement is not a substitute for an existing contract, it does not extinguish the earlier agreement.

## D. TRIAL COURT'S AWARD OF 10% OF THE COMPANY'S NET PROFITS

### 1. 10% NET PROFITS WAS NOT TIED TO MR. BROWN'S FUTURE EMPLOYMENT

The Company and the Teagues next argue the trial court erred by awarding Mr. Brown 10% of the Company's net profits after he was terminated from Columbia Precast. They argue this promise of 10% of the Company's profits was meant as compensation that was payable only while Mr. Brown continued to be employed by the Company. We do not agree. With respect to this issue the trial court found:

> The preponderance of the evidence supports the ten percent net profits provision of the parties' agreement was not tied to future employment but instead was an earned benefit that Mr. Brown should have received. The preponderance of the evidence further supports the existence of a contract between the parties which Mr. Teague and Columbia Precast breached causing Mr. Brown damages when Columbia Precast was sold as well as during the years between his termination and the sale.

-11-

Construing the agreement as we do, we also conclude Mr. Brown earned his 10% ownership interest in the Company in January 2003, once he completed his six-year term of employment with Columbia Precast. As an owner of 10% of the Company, Mr. Brown was entitled to 10% of Columbia Precast's profits. We thus affirm the trial court's conclusion that the 10% net profits provision of the parties' agreement was not tied to Mr. Brown's future employment, but was an earned benefit Mr. Brown was entitled to receive.

### 2. THE TRIAL COURT PROPERLY AWARDED PROFITS FOR 2005 AND 2008

The Company and the Teagues' final argument is that the trial court erred in awarding Mr. Brown 10% of the Company's net profits for the years 2005 and 2008 because there was no competent proof in the record to support those awards. The trial court relied on Columbia Precast's audited financial statements for the years 2005 through 2008, which were admitted as an exhibit during the trial, to calculate how much to award Mr. Brown for his 10% ownership interest in the Company. The court explained:

> In handling the sale of Columbia Precast, LLC, Mr. Teague used and relied upon the financial statements entered as Trial Exhibit 15, adopted them for use in the negotiations to sell and provided that information to Mr. Taylor and Mr. White.

The Company and the Teagues do not contend the net profit amounts stated in the financial statements were incorrect, only that they did not constitute competent evidence. While Mr. Teague does not dispute that he provided the financial statements for the years 2005 through 2007 to the purchasers of Columbia Precast, Mr. Teague testified he did not use the 2008 financial statement in his negotiations to sell the Company. Mr. Teague testified as follows:

MR. BOSTON: During the negotiations with the new owners, am I correct, Mr. Teague, that you would have gathered for them and presented them with Exhibit 15, which is the financial statements of your company dating back from 1998 through December 31, 2008? That would have been information you provided to these purchasers, correct?

A: I would not have given them the last financial statement.

Q: The December 31 of '08?

A: That's correct.

Q:    But you would have given them up through then December 31, 2007?

A:    Yes.

Q:    And in December 31, 2008, did you still own the company?

A:    Officially.

Q:    And was the net income that year $3,007,161?

A:    I can't tell you that but if that's what it says then I'm going to allow the accountants to say that.

Q:    And throughout your professional life in this particular business, you relied on the accountants, haven't you?

A:    That's correct.

In the Purchase Agreement between the Teagues and the buyers of Columbia Precast, the Teagues represented the following:

(c) *Financial statements*.  Seller is solvent and has made adequate provision for payment of its debts.  It has delivered to purchaser copies of its financial statements, for the four years ending December 31, 2007, including balance sheets as of the end of the last four years, statements of profit and loss accounts and surplus for the last four years.  All such statements have been prepared in conformity with generally accepted accounting principles applied on a consistent basis, and fairly reflect the financial position of seller as of the end of such periods and the result of operations during such periods.

Rule 803 of the Tennessee Rules of Evidence lists exceptions to the hearsay rule. Rule 803(1.2) makes clear that admissions by party-opponents are excepted from the rule against hearsay.  Rule 803(1.2) provides as follows:

**Admission by Party-Opponent.**  A statement offered against a party that is (A) the party's own statement in either an individual or representative capacity, or (B) a statement in which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject . . . .  An admission is not excluded merely because the statement is in the form of an opinion.

Mr. Teague's testimony, together with his representation in the Purchase Agreement, indicate he has manifested an adoption or belief in the truth of the audited financial statements marked as an exhibit during the trial. Although he may not have provided the 2008 financial statement to the purchasers of the Company, he deferred to his accountants when answering the question about the Company's net income in 2008 and therefore adopted their statement of the Company's net income for 2008. Accordingly, the audited financial statements qualify as an admission by the Teagues of Columbia Precast's financial condition at the end of 2005 and 2008 and do not constitute inadmissible hearsay.

The trial court appropriately relied on the Company's audited financial statements to determine Columbia Precast's net profits for the years 2005 and 2008. We do not find the evidence preponderates against the trial court's determination that Columbia Precast had net profits of $600,200 in 2005 and $3,007,161 in 2008. Thus, we affirm the trial court's conclusion that Mr. Brown is entitled to $60,020 for the 2005 year and $125,298.38 for the 2008 year.

## IV. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment in all respects. Costs are taxed to Columbia Precast, LLC, Roger Teague, and Barbara Teague, for which execution shall issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

-14-